UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| BRANDON M. MEYER,<br><br>    Plaintiff,<br><br>    v.<br><br>CORIZON MEDICAL SERVICES et al.,<br><br>    Defendants. | Case No. 1:15-cv-00466-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

# I. OVERVIEW

Plaintiff Brandon Meyer complains that Defendants provided him with inadequate mental health treatment, in violation of the Eight Amendment to the Constitution, while the Idaho Department of Corrections ("IDOC") housed him as an inmate at the Idaho State Correctional Institution ("ISCI") outside of Kuna, Idaho. Defendant Corizon, LLC ("Corizon") is a company that provides medical services to inmates at ISCI. Defendant Dr. Scott Eliason is a Corizon employee and one of Meyer's treating psychologists at ISCI. Defendant Keith Yordy is the warden at ISCI.

This matter comes before the Court on three motions for summary judgment: one filed jointly by Corizon and Eliason, one filed by Yordy, and one filed by Meyer. Dkts. 39, 40, 43. Having reviewed the record and briefs, the Court finds that the facts and legal arguments are adequately presented. Accordingly, in the interest of avoiding further delay, and because the Court finds that the decisional process would not be significantly aided by

oral argument, the Court will decide the pending motions without oral argument. Dist. Idaho Loc. Civ. R. 7.1(d)(2)(ii). For the reasons set forth below, the Court **GRANTS** the Defendants' motions and **DENIES** Meyer's motion.

## II. BACKGROUND

### A. *Factual Background*

In October of 2014, Meyer was transferred to ISCI. Meyer has a history of depression, anxiety, bipolar disorder, suicidal ideations, and drug and alcohol abuse. Eliason "treated [Meyer] in the outside community before his incarceration and was well aware of his medical records, substance abuse history, and mental health history upon his arrival at ISCI." Dkt. 27-1, at 4. When Meyer arrived at ISCI on October 2, 2014, he filled out a "medical history and screening form." Dkt. 27-2, at 2–7. On that form, Meyer indicated that he was taking Zyprexa, Clonazepam, Effexor, and Prilosec and indicated that he had been hospitalized several times for suicidal ideations. *Id.* at 4–6. That day, a licensed nurse practitioner named Effie Reed screened the form, cleared Meyer for general housing, and referred Meyer to "mental health" for a follow up evaluation within 24 hours. *Id.* On October 3, a licensed professional counselor named C. Bennett evaluated Meyer. *Id.* at 6. The counselor determined that Meyer was exhibiting some depression, but that his risk of self-harm was low. *Id.* The counselor also scheduled Meyer for another mental health assessment within fourteen days. *Id.*

On October 7, a licensed master of social work named B. Lewis performed a "secondary mental health assessment/evaluation" of Meyer. *Id.* at 7. During this

evaluation, Meyer reported four previous suicide attempts and stated that he had previously been prescribed Haldol, Effexor, "lithium, Geodon, Zyprexa, Buspar, 'everything.'" *Id.* at 7–8. Meyer also reported that he was concerned about bipolar disorder and that he had experienced auditory and visual hallucinations, PTSD, and had a history of alcohol abuse. *Id.* at 12. The social worker formulated an initial treatment plan, on which Meyer signed off, and recommended that Meyer be referred to ISCI's "specialized Mental Health unit." *Id.* at 13–14.

On October 9, 2014, Eliason "assessed and evaluated [Meyer] in person." Dkt. 27-1, at 6. Meyer reported increased anxiety "since he was taken off [K]lonopin recently." *Id.* Eliason noted that at that time Meyer was taking Zyprexa, Effexor, and Cogentin. Dkt. 27-2, at 15. Eliason determined that the Cogentin was unnecessary and discontinued Meyer's Cogentin prescription. *Id.*; Dkt. 27-1, at 6. Finally, Eliason diagnosed Meyer with alcohol and cannabis use disorder, bipolar disorder, and generalized anxiety disorder. Dkt. 27-1, at 6.

On October 21, 2014, a licensed master of social work from the Behavioral Health Unit named T. Ruth assessed Meyer, this time to develop a longer-term treatment plan. *Id.*; Dkt. 27-2, at 17. Among other things, Meyer reported his Effexor prescription had been discontinued after he had stopped taking it three days prior and that he wanted to have it restarted. Dkt. 27-2, at 17. The social worker recommended that IDOC house Meyer in the Behavioral Health Unit for a 30-day assessment period. *Id.* The social worker also drafted a treatment plan, on which Meyer signed off. *Id.* at 17.

Through 2014 and 2015, Eliason and T. Ruth continued to meet with Meyer to assess his mental health and treatment plan about once a month. Both encouraged Meyer to enroll in anxiety and depression groups and to engage in "behavioral activation," such as group therapy, taking classes, or exercising, to improve his mood. In 2014, T. Ruth met with and evaluated Meyer on November 13 and December 17. In 2015, T. Ruth met with Meyer on at least all of the following dates: January 14, February 18, March 4, April 8, April 22, June 23, August 3, October 5, October 22, October 28, and November 26. During 2015, several other mental health professionals met with and evaluated Meyer on occasion. T. Ruth and these other mental health professionals created, implemented, and adjusted several individualized treatment plans for Meyer.

Eliason continually monitored and adjusted Meyer's medication to find a formula that worked for him, based on objective observations and Meyer's subjective reports. In 2014, Eliason saw Meyer on November 26 and December 17. At the November 26 examination, Eliason increased Meyer's dosage of Effexor. During the December 17 examination, Eliason discontinued Meyer's Zyprexa prescription and replaced it with Depakote. In 2015, Eliason saw Meyer (and adjusted his medications) on the following dates: February 18 (increased Effexor), April 1 (increased Depakote), May 27, June 10 (added Abilify), July 8 (added Buspar), August 26 (added Inderal), September 23 (stopped Inderal, increased Abilify), September 30 (increased Abilify), November 18 (started Zyprexa), and December 15 (discontinued Zyprexa, started Vistaril, increased Burspar). Eliason was always informed if Meyer refused his medication on three

consecutive occasions. This pattern of refusal occurred at least twice during 2014 and 2015.

During the spring of 2015, Meyer twice filed medical grievances. On March 31, 2015, Meyer filed Grievance No. II 150000349, in which he complained about Eliason's medical decision to change Meyer's prescription mental health medications. On initial review, Corizon employees advised Meyer that he could raise his medication concerns with Eliason during his scheduled appointments. Meyer appealed this response. In April of 2015, Rona Siegert, IDOC's Health Services Director, reviewed the grievance on appeal and Meyer's medical files. Siegert did not find any indifference to Meyer's medical needs in her review. She concluded that Eliason had evaluated and diagnosed Meyer before determining, in his professional judgment and opinion, what medications he felt were best to treat his mental health condition. She issued a written decision on the grievance and directed Meyer to discuss any concerns he had with Eliason directly.

On May 19, 2015, Meyer filed Grievance No. II 150000550, in which he complained that Eliason had not written a diagnosis of Meyer's health conditions in completing the reply section of a concern form. Upon initial review, Corizon employees advised Meyer that he could see Eliason or his clinician to review his diagnosis and treatment plan. Meyer again appealed. Seigert reviewed the grievance on appeal in June of 2015. She answered the grievance by stating Meyer would not be given copies of his medical records, but he could clarify his diagnosis with Eliason or his clinician.

Meyer submitted concern forms to Warden Yordy on August 20, 2015, and August 27, 2015. In these forms, Meyer again complained about Eliason's treatment of his mental health conditions and his prescribed medications. Yordy replied stating that he would forward the concern forms to an IDOC Contract Monitor for review. Megan Austin, a registered nurse and contract monitor, received and reviewed the two concern forms. Thereafter, she reviewed Meyer's medical files and concluded that Meyer was being treated appropriately.

Meyer submitted two more grievances about his mental health treatment on August 14, 2015, and September 24, 2015. These grievances were not accepted pursuant to IDOC's Standard Operating Procedures because they were repetitive of Meyer's March 31, 2015 grievance.

On October 5, 2015, Meyer filed his initial complaint in this case. Dkt. 1. After Meyer filed his complaint, Meyer continued to have mental health problems. On November 5, 2015, IDOC placed Meyer on "suicide watch" after he was found to have cut himself. Dkt. 27-2, at 64–67. IDOC placed Meyer on suicide watch again on November 11, November 21, and November 25, after he reported swallowing razor blades and cutting himself. *Id.* at 73-77, Dkt. 27-3, at 9–39. Subsequent x-rays did not confirm the presence of razor blades in Meyer's system. After each incident, Corizon employees monitored him closely. Each time IDOC released Meyer's from suicide watch, he had three follow-up clinical visits scheduled.

After these incidents, Eliason continued to monitor and adjust Meyer's medication regiment. Meyer also continued to meet with mental health professionals who monitored his mental health and progress under his treatment plan.

*B. Procedural Background*

Meyer filed two separate cases in October of 2015. Judge B. Lynn Winmill allowed Meyer to consolidate the two cases and then conducted an initial review of the case to determine whether summary dismissal was appropriate under 28 U.S.C. §§ 1915(d)(2) and 1915A(b). Dkt. 11. Judge Winmill determined that Meyer had asserted colorable Eighth Amendment claims only against Corizon and Yordy. *Id.* Shortly thereafter, Meyer filed an Amended Complaint. Dkt. 18. Judge Winmill conducted another initial review under 28 U.S.C. §§ 1915(d)(2) and 1915A(b). Dkt. 19. This time Judge Winmill concluded Meyer had stated a colorable Eighth Amendment claim against "Defendant Eliason, based on [his] allegation that Eliason is the medical provider who, in October 2014, removed Plaintiff from his mental health medications without examining Plaintiff himself or Plaintiff's medical records." Dkt. 19, at 3. Judge Winmill reaffirmed that Meyer may proceed on his claim against Yordy (for injunctive relief alone), as he is "the official who appears to have direct responsibility over Plaintiff's conditions of confinement." *Id.* Judge Winmill also reaffirmed that Meyer's allegations stated a plausible policy claim against Corizon for failure to provide adequate mental health treatment based on the alleged removal of Meyer from his medications without an examination, as well as Meyer's subsequent mental health treatment. Accordingly, Judge

Winmill allowed Meyer to proceed against Corizon for damages and injunctive relief. *Id.* at 3–4. Finally, Judge Winmill dismissed Meyer's Eighth Amendment claims to the extent they were based on alleged inadequate treatment of his chronic back pain (*id.* at 4–5), and Meyer's Americans With Disabilities Act claims (*id.* at 5–7).

Meyer's Amended Complaint asserts four claims related to his mental health treatment (on which Judge Winmill allowed Meyer to proceed). Dkt. 18. In Claim I, Meyer asserts that Defendants discontinued four medications he was taking as part of his mental health treatment—Wellbutrin, Clonazepam (Klonopin), Abilify, and Neurontin—without any mental health evaluation. Dkt. 18, at 2. In Claim II, Meyer asserts that since October 2, 2014, he has reported his need for mental health treatment to Defendants and they have put him through a "series of trials and errors" during which he was required to take ineffective medication that he had already tried with negative results. *Id.* at 3. In Claim III, Meyer asserts he has "not been able to make [his] mental health concerns known," Corizon employees evaluated him "in an [un]professional manner," and that his mental health "evaluations [were not] done in person." *Id.* Finally, in Claim IV, Meyer asserts that Defendants knew "of my worsening mental health conditions and . . . willingly and knowing ignored [his] need for specific mental health treatments." *Id.* at 4.

After Judge Winmill's ruling on his Amended Complaint, Meyer filed a motion for preliminary injunction, a motion to file another amended complaint, and a motion for appointment of counsel. Judge Winmill denied all of these motions. Dkt. 31.

On November 10, 2016, Corizon and Eliason, together, and Yordy, separately, filed motions for summary judgment. Dkts. 39, 40. The Court sent Meyer a notice of his rights and obligation to respond to the motions. Dkt. 41. Instead of filing a direct response, on November 28, 2016, Meyer filed his own (two page) motion for summary judgment together with an affidavit. Dkt. 43. Defendants responded to this motion, (Dkts. 44, 45), and Meyer never filed a reply brief.

On May 12, 2017, Meyer notified the Court that IDOC had released him and that he had moved to Florida. Dkt. 48.

On August 1, 2017, Judge Winmill transferred this case to the undersigned. Dkt. 49.

### III. LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). This Court's role at summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Zetwick v. Cty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) (citation omitted). In considering a motion for summary judgment, this Court must "view[] the facts in the non-moving party's favor." *Id*. To defeat a motion for summary judgment, the respondent need only present evidence upon which "a reasonable juror drawing all inferences in favor of the respondent could return a verdict in [his or her] favor." *Id.* (citation omitted). Accordingly, this Court must enter summary judgment if a party "fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The respondent cannot simply rely on an unsworn affidavit or the pleadings to defeat a motion for summary judgment; rather the respondent must set forth the "specific facts," supported by evidence, with "reasonable particularity" that precludes summary judgment. *Far Out Productions, Inc. v. Oskar*, 247 F.3d 986, 997 (9th Cir. 2001).

## IV. ANALYSIS

### A. The Applicable Law

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To succeed on a claim under § 1983, Plaintiff must establish the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

To bring a successful § 1983 claim against a governmental entity or a private entity performing a government function, a plaintiff must establish that the execution of an official policy or unofficial custom inflicted the injury of which the plaintiff complains, as required by *Monell v. Department of Social Services of New York*, 436 U.S. 658, 694 (1978). *See also Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the

following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110–11 (9th Cir. 2001).

Meyer asserts that Defendants violated his Eighth Amendment rights. The Eighth Amendment to the United States Constitution protects prisoners against cruel and unusual punishment. Initially, the Supreme Court only applied the Eighth Amendment to claims of "inhuman techniques of punishment." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). The Supreme Court has subsequently "held that the Amendment proscribes more than physically barbarous punishments." *Id.* Now, "[t]he Amendment embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . ,' against which we must evaluate penal measures." *Id.* (internal citation omitted). Accordingly, "punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society'" violate the Eighth Amendment. *Id.* (quoting *Trop v. Dulles*, 356 U.S. 86, 101 (1958)). Under these standards, the government has an "obligation to provide medical care for those whom it is punishing by incarceration." *Id.* at 103. The standard for these types of claims is "deliberate indifference." *Id.* In other words, "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eighth Amendment." *Id.* (internal citation omitted). Examples of actionable Eighth Amendment medical claims

include a prison doctor's indifference to a prisoner's medical needs or a prison guard's intentional interference with prescribed treatment. *Id.* at 104–05. An accident or mere negligence, however, cannot form the basis of a medical-based Eighth Amendment claim. *Id.*

An actionable Eighth Amendment claim for inadequate medical care must meet two elements. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). First, the plaintiff must allege "the existence of a serious medical need." *Id.* An objective standard applies to this element. *Id.* "Such a need exists if failure to treat the injury or condition 'could result in further significant injury' or cause 'the unnecessary and wanton infliction of pain.'" *Id.* (quoting *Jett v. Penner,* 439 F.3d 1091, 1096 (9th Cir. 2006)). "Indications that a plaintiff has a serious medical need include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.'" *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992)). Second, the plaintiff must allege that a prison official was "deliberately indifferent." *Id.* A subjective standard applies to this element. *Id.* "A prison official is deliberately indifferent" under this standard "only if the official 'knows of and disregards an excessive risk to inmate health and safety.'" *Id.* (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)). "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994)). Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi*, 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

### 1. Eliason's Liability

As an initial matter, the Court assumes that Meyer's mental health problems constitute a serious medical need. Nevertheless, the Court finds summary judgment in favor of Eliason is proper because Meyer has failed to produce evidence that Eliason was deliberately indifferent to Meyer's mental health needs. As explained above, Meyer asserts that Eliason was deliberately indifferent to his mental health needs in four ways: (1) by discontinuing four medications he was taking as part of his mental health treatment—Wellbutrin, Clonazepam (Klonopin), Abilify, and Neurontin—without any mental health evaluation when he arrived at ISCI; (2) by putting him through a "series of trials and errors" during which he was required to take ineffective medication; (3) by preventing him from making his mental health concerns known and evaluating him in an unprofessional manner; and (4) ignoring his need for specific mental health treatments.

The record shows several ISCI employees evaluated Meyer within his first week at ISCI. In particular, Eliason, who was familiar with Meyer's mental health needs before he entered ISCI, assessed and evaluated Meyer in person on October 9, 2014. Eliason determined what medication Meyer was taking, assessed what medication was necessary based on Meyer's needs, and adjusted his medication accordingly. Thus, Eliason's assertion that Eliason took him off of several medications without any evaluation appears to be inaccurate. Thereafter, Eliason, and other ISCI employees, periodically met with Meyer and assessed his mental health condition. Eliason continued to adjust Meyer's medication throughout his time at ISCI. While there may have been some "trial and error" in prescribing, nothing in the record indicates Eliason was deliberately indifferent to Eliason's mental health needs. Rather, he continued to adjust and change Eliason's medication in an attempt to find the combination that would maximally assist Meyer in his ongoing mental health struggles. If anything, Meyer's complaints amount only to a difference in opinion about the appropriate medical treatment. *See Lopez v. Corizon, Inc.*, No. 115-CV-00123-EJL-CWD, 2016 WL 3014645, at *11 (D. Idaho May 24, 2016) ("Plaintiff's disagreement with this treatment plan and desire for a prescription of Wellbutrin is just that—a disagreement, which is not actionable under Section 1983."). Moreover, the chosen course of action was not "medically unacceptable under the circumstances," or chosen "in conscious disregard of an excessive risk" to Meyer's health. *Toguchi*, 391 F.3d at 1058. The record also shows Meyer was able to make his mental health concerns known during his periodic appointments with Eliason, T. Ruth,

and other Corizon employees. And, there is nothing in the record that indicates Eliason, or any other Corizon employee, was unprofessional during Meyer's appointments, or dismissive of Meyer's medical needs. In sum, there is no evidence that Eliason was deliberately indifferent to Meyer's mental health needs. Accordingly, the Court must grant summary judgment in favor of Eliason.

### 2. Corizon's Liability

Corizon, a corporation performing a government function, may be held liable only if a policy or custom of the corporation caused the alleged deprivation of constitutional rights. The Court finds it appropriate to grant summary judgment in Corizon's favor first because Meyer has failed to establish his Eighth Amendment rights were violated. As explained above, multiple Corizon employees evaluated and met with Meyer on a regular basis to assess his mental health needs. They also worked with Meyer to develop an individualized long-term treatment plan. During these appointments he was given an avenue to have his mental health concerns heard. Eliason adjusted Meyer's medication according to their efficacy and Meyer's needs. Nothing indicates Corizon employees were unprofessional or dismissive. Thus, Meyer has failed to establish that Corizon employees were deliberately indifferent to his mental health needs. Further, even if Meyer's allegations regarding his mental health treatment were taken as true, nothing in the record supports a finding that Corizon's custom or policy caused Meyer's injury. Corizon does not have a pattern or policy of taking inmates off of their prescribed medication without proper evaluation, prescribing ineffective medication, ignoring

inmates mental health needs, or blocking inmates attempts to have their mental health concerns heard. Therefore, summary judgment in Corizon's favor is appropriate.

### 3. Yordy's Liability

A supervisory official is not liable for the actions of subordinates on a respondeat superior theory under 42 U.S.C. § 1983. *Jeffers v. Gomez*, 267 F.3d 895, 915 (9th Cir. 2001). "A supervisor may be liable under § 1983 only if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Id.* (internal quotations omitted). A causal connection is "an affirmative link" between a constitutional deprivation and "the adoption of any plan or policy by [a supervisor,] express or otherwise showing [his or her] authorization or approval of such misconduct." *Rizzo v. Goode*, 423 U.S. 362, 371 (1976).

Meyer has not alleged that Yordy had any personal involvement in the alleged violation of his Eighth Amendment rights. Rather, Meyer's allegations focus on the treatment Eliason provided. Yordy cannot be liable for Eliason's actions under a respondeat superior theory. Even if Yordy could be liable under such a theory, his claims would still be unsuccessful because, as explained above, Meyer received constitutionally adequate mental health treatment from Eliason and other Corizon employees while at ISCI. Yordy's only personal involvement with Meyer's treatment was his reception of two complaints filed by Meyer about his mental health treatment. Yordy ensured these complaints received a full review and decision. Thus, the record does not show that

Yordy, individually, was deliberately indifferent to Meyer's mental health needs. There is also no evidence in the record that Yordy adopted any plan or policy that caused a violation of Meyer's Eighth Amendment rights or otherwise approved of any conduct that was deliberately indifferent to Meyer's mental health needs. Accordingly, the Court finds it appropriate to grant summary judgment in Yordy's favor.

## V. CONCLUSION

There are no disputes of material fact in this case. Defendants Eliason, Corizon, and Yordy have established, based on the undisputed facts, that they are entitled to judgment as a matter of law on Meyer's Eighth Amendment claims. Accordingly, this Court enters summary judgment in Defendants' favor and against Meyer.

## ORDER

IT IS HEREBY ORDERED:

1. Corizon, LLC and Dr. Scott Eliason's Motion for Summary Judgment (Dkt. 39) is **GRANTED**.

2. Keith Yordy's Motion for Summary Judgment (Dkt. 40) is **GRANTED**.

3. Brandon M. Meyer's Motion for Summary Judgment (Dkt. 43) is **DENIED**.

4. The Court will enter judgment separately in accordance with Fed. R. Civ. P. 58.

DATED: November 14, 2017

David C. Nye
U.S. District Court Judge